## THE STATE v. YATES, Appellant.

### Division Two, February 12, 1901.

**Criminal Law: LARCENY: FELONIOUS INTENT: INSTRUCTION.** An instruction, under an indictment for larceny, which required the jury to find defendant guilty if they believed from the evidence that he took the property "with the intent to convert the same to his own use, or to deprive the owner thereof of his property, permanently," is criticised as unskillful, but *held,* not obnoxious to the charge of lacking the element of felonious intent.

Appeal from Barton Circuit Court.—*Hon. H. C. Timmonds,* Judge.

AFFIRMED.

*A. C. Burnett* for appellant.

*Edward C. Crow,* Attorney-General, and *Sam B. Jeffries,* Assistant Attorney-General, for the State.

The third instruction, in which the court told the jury what it was necessary for them to find in order to convict,

failed to say that the stealing must have been done with felonious intent; it did instruct that it must have been done with the intent to convert the same to his own use, or deprive the owner thereof of his property permanently, and this supplied the place of the word "feloniously," and sufficiently defined the intent, which was necessary for a conviction. State v. Sasseen, 75 Mo. App. 201; Philamalee v. State, 78 N. W. 625.

SHERWOOD, P. J.—The larceny of a black gelding with white hind feet, the property of John S. Murray, from the rack to which it was hitched, on the evening of about the twenty-third of September, 1897, in the town of Golden City, Barton county, Missouri, is what caused defendant's arrest and finally his conviction at the hands of a jury to whom his cause was committed, and that jury brought in this verdict: "We, the jury, find the defendant, James B. Yates, guilty as charged in the indictment, and assess his punishment at imprisonment in the penitentiary for a term of two years."

A fair outline and summary of the evidence made out by the State's attorney, is the following:

On the evening of on or about the twenty-third of September, 1897, one Lee L. Murray rode his brother's horse from the farm where they lived to the town of Golden City, a distance of six miles. The horse was a black gelding, with white hind feet, something over fifteen hands high, of the weight of about 950 pounds, and of the value of about forty dollars. On the way he was overtaken by Jim Yates, the defendant, who rode a bay roan horse; his saddle blanket was white and was somewhat too large, and it was noticeable that a part of it extended behind the saddle. Murray had no saddle blanket. The defendant had a bottle of whiskey, and insisted upon Murray's drinking, but Murray tipped the bottle

each time with the pretense of drinking, but did not taste it; the parties seem to have been working the same deception upon each other, however, for after the defendant had tipped the bottle a number of times, Murray noticed that it was still full. Murray testified, however, that the defendant acted like one who was drinking. They reached town after seven o'clock, which was after dark, and hitched their horses at the same rack, and Murray and the defendant separated; when Murray returned for his horse at ten o'clock, it was gone, as was also the defendant's.

Robert Bevans, the city marshal of Golden City, that night between eight and nine o'clock saw a man on a light colored horse leading a black horse by the bridle, coming from the direction of the rack where the two horses before described had been hitched; the horse he was leading was not going as fast as the man seemed to wish, and the man was jerking him by the bridle as if to hurry him along. He was going north out of the town; this was the direction of the place where the defendant lived, about four miles distant.

At about eight o'clock that night, one George Coiner, who lived on that road, about one and three-fourth miles from defendant's house, saw a man pass, riding one horse and leading another, going in the direction of the defendant's.

Between eight and nine o'clock that evening a party of young men were riding along that road to the house of one C. J. Patterson, about one mile from the defendant's; they were out on a charivari expedition. They met this man riding one horse and leading another; the horse he led was of dark color, and had white hind feet. This was testified to by Charles Surburg, Floyd DeGood, George Kenzie, S. Van-Eaton and Bert Weigand, who were among the number. One of these witnesses swore that he thought he recognized the man as Jim Yates, the defendant, but he could not be sure about that.

G. M. Wilkerson, who lived on a farm adjoining that of the defendant, testified that he was at defendant's frequently, hauling water, and that, from the twenty-second of September until the second Saturday following, the defendant was not at home.    Eli Johnson was there attending to the stock.

Eli Johnson, a third cousin of the defendant, testified that he was living with the defendant at the time, and that on the evening of the twenty-second of September, the defendant came home riding one horse and leading another; defendant had witness put up the horse he had been riding, and rode the other horse away and was gone about two weeks.

During the week at the close of September and the beginning of October there was a reunion at Chetopa, Kansas, and according to the testimony of several witnesses who were there, the defendant was at that reunion with a black gelding, with white hind feet; this horse, the witnesses testified, was about five or six years old, and weighed about a thousand pounds.

Thomas Evans testified that during the reunion at Chetopa he saw the defendant about one and a quarter miles east of Chetopa; his horse was wet with perspiration, and he said he had gotten into trouble at Golden City and had ridden his horse hard for the officers had been after him.

G. W. Vincent, the constable, testified that when he arrested the defendant, defendant told him that he had been to Greenfield, Dadeville, Jerico and El Dorado.

The State showed that the defendant, after giving bond for his appearance at the circuit court, did not appear, and a forfeiture had been taken on the bond; and also proved that while the defendant was confined in jail to await his trial, he tried to affect an escape by taking the iron grate out of a stove, with which to loosen some bolts about the jail.

On behalf of the defendant, Lem Lindsay, who lived near the farm on which the defendant lived, testified that before the

State v. Yates.

defendant went away he had seven horses there at the farm, and after he left there were only five remaining. Witness said that Eli Johnson told him that defendant had gone to a place on Sac river.

Henry Ellison, who was in the restaurant business in Golden City, testified that on the Saturday following the . Thursday on which Murray's horse disappeared from the rack there in town, he stepped out of the door of his restaurant to throw out some water and saw a man in a wagon watering his horses. He took this man to be the defendant at the time, but on cross-examination said that it could have been defendant's brother.

The defendant swore that he was at the reunion at Chetopa, Kansas, but that it was on Wednesday, and that it was earlier in the month of September than the dates testified to by the State's witnesses; that he had returned before the time that Murray's horse was said to have disappeared. He denied that he led any horse home that evening, and denied that he went away that night, but said that he remained at home until the following Saturday, when he drove to Golden City, and back home; he then put his saddle on his bay horse, and rode to Lockwood, from there to Greenfield, thence down the river fishing with an old comrade he had met, and then to Greenfield again, and back to Lockwood. He said that the horse, which he rode at the reunion at Chetopa, was a small stallion belonging to his brother-in-law, and not a gelding, and that soon thereafter it was drowned. He further testified that he had never attempted to break jail, but that he and his fellow prisoners turned over a stove in a spirit of restlessness and put it up again; that he had no thought of using the grate of the stove as a tool with which to loosen the bolts to get out. He said that when he left that part of the country, after having given bond for his appearance, he did so with an understanding

Vol 159 mo—34

and with the consent of his bondsmen; that he went away in search of employment and not to avoid prosecution.

The indictment is in the usual form. The court, with one exception to be presently mentioned, gave the usual instructions touching presumption of innocence, credibility of witnesses, the effect unexplained of the recent possession of stolen property; the effect of record entries showing forfeiture of defendant's recognizance, and confining them to the sole purpose of tending to show an attempt on the part of defendant to avoid prosecution. And of its own motion the court gave an instruction about flight raising a presumption of guilt.

The third instruction which the court gave will now be copied and discussed:

"3. You are further instructed that if you shall believe from the evidence that the defendant, James B. Yates, on or about the twenty-third day of September, 1897, at the county of Barton and State of Missouri, did steal, take and carry away the gelding mentioned in the indictment, being the property of John S. Murray, with the intent to convert the same to his own use, or to deprive the owner thereof of his property permanently, then you will find the defendant guilty as charged, and assess his punishment at imprisonment in the penitentiary for a term of not less than two nor more than seven years; that unless you so find you will acquit the defendant."

This instruction though not drawn with much skill, yet is not obnoxious to the charge of lacking the element of felonious intent. This, though not presented in terms in the instruction, is recognizably there in meaning. [Philamalee v. State, 78 N. W. 625; State v. Sasseen, 75 Mo. App. 201.]

The court properly refused the instruction which defendant asked in the nature of a demurrer to the evidence. If there is not *prima facie* sufficient evidence in this case, on the

State v. David.

part of the State, to convict defendant, then, assuredly, property in horse-flesh is held by a very precarious tenure in this State.

On the part of defendant a number of very favorable instructions were given and asked, relating among other things to circumstantial evidence, and the necessity when this sort of evidence alone is relied on, that then the facts must be inconsistent with any other rational theory but that of defendant's guilt, etc.

Instruction numbered 3, which the court refused defendant, had already, in so far as correct, been embraced in those which had been given.

Finding no reversible error in the record, we affirm the judgment. All concur.